## FORD & COMPANY *v.* LAWSON.

1. Where a person claiming to own certain cotton, and dealing with it, not as a broker or cotton buyer, but as an individual holder, entered into negotiations with another for its sale, and in one letter stated that "my cotton will grade Atlanta 3's; it has been graded by several, and that is what it graded; . . it is a selected lot of cotton," and in another letter stated that he would like to know if the party to whom he wrote would like to buy a specified number of bales of cotton, "good cotton, all in fine condition," and followed this with a telegram asking the other party to "wire best price two hundred bales good cotton," whereupon a price was offered and accepted, in a subsequent suit by the purchaser, for a breach of the contract to deliver cotton of the agreed quality, it was

competent for the purchaser to testify that the bales of cotton mentioned in the correspondence, a large part of which was sold, comprised all the cotton which the vendor had, and that the vendee bought the cotton relying on the representations as to grade set out in the letters preceding the telegrams, in connection with the terms thereof.

(a) The term "good cotton" was subject to parol explanation to show its meaning as used in the contract.

2. If there was a breach of the contract to deliver the cotton of the quality agreed to be sold, and the vendor tendered other cotton of a lower grade, an independent offer to accept such cotton, made some two weeks later when the price of cotton had risen, would not be admissible in evidence; but if, a week or two after the alleged breach, the purchaser went to see the vendor in regard to the cotton, stated that he did not know whether he had bought it based on the grade now contended for in the suit, and that he needed it and would take the defendant's cotton as it was, such conversation was admissible.

3. It was error to charge that "The question is, whether or not [the vendee] delivered the cotton at the time and place stated, or whether he endeavored or offered to so deliver it." There was no evidence of actual delivery; and the mere endeavor to deliver cotton of a certain quality sold is no sufficient defense to an action for breach of the contract to make such delivery.

4. Where, in an action for breach of contract in failing to deliver a certain number of bales of cotton of a given quality, contracted to be sold by the defendant to the plaintiffs, the petition alleged that the plaintiffs were at all times willing and ready to perform their part of the contract, and to accept, receive, and pay for the cotton according to the agreement, but that the defendant failed and refused to perform his part thereof, and these allegations were denied by the defendant in his answer, evidence on behalf of the latter that he had offered to deliver and tendered the cotton to the plaintiffs' agent at the time provided in the contract, and of the agreed quality, and that the plaintiffs' agents refused to accept it, was admissible, although there was no plea of tender.

5. If one party to a continuing contract, consisting of mutual obligations, renounces and repudiates it prior to the date fixed for performance, the other party is at liberty either to immediately treat such renunciation as a breach of the contract and sue for damages sustained therefrom, or to treat the contract as still binding, and wait until the time arrives for its performance, in order to give the party who has repudiated the contract an opportunity to comply with its terms. If he adopts the latter course, and at the time fixed for performance demands compliance on the part of the other party, his right of action for a breach depends on whether or not such compliance is then made.

6. In a suit for breach of contract for failure to deliver cotton of a stated quality, sold at a specified price, the measure of damages was the difference between the contract price and the market price at the time and place of delivery, no other special damage appearing.

(a) If there was no market at the town where the delivery was to be made at the time fixed therefor, the price at the nearest market, with the expense of transportation to the place of delivery, could be shown.

(*b*) Evidence of the market price in a town near by that where the delivery is to be made is ordinarily inadmissible. But if it appears that the market price in the two towns is the same, evidence of what it is in one is competent as tending to show what it is in the other.

Argued February 8,—Decided August 14, 1909.

Action for breach of contract. Before Judge Reagan. Butts superior court. July 10, 1909.

B. B. Ford & Company sued F. M. Lawson for a breach of contract in failing and refusing to deliver 200 bales of cotton alleged to have been sold by the defendant to the plaintiffs. The plaintiffs lived in Macon. The defendant lived in Flovilla. Set out in the petition were certain letters and telegrams between the parties. On April 15, the plaintiffs wrote to the defendant that their agent had sent to them a letter of the defendant "in reference to buying your cotton," that they would be glad to trade with him and could send a man up almost any day. On April 17, 1905, the defendant wrote to the plaintiffs, acknowledging the receipt of their letter and saying: "I want to keep in correspondence with you; and when you have an order for 200 or 300 B/c. good cotton, you can let me hear from you, and perhaps we can be of mutual benefit to each other. My cotton will grade Atlanta 3's. It has been graded by several, and that is what it graded. . . It is a selected lot of cotton." On April 25, the defendant wrote to the plaintiffs a postal card saying, "I write to know if you would like to buy 230 B/c. good cotton, all in fine condition, and what you can pay. Let me hear at once." On April 26, he telegraphed to the plaintiffs, "Wire best price two hundred bales good cotton." The plaintiffs replied by telegram saying, "Offer seven cents f. o. b., if very quick. Answer. Name your lowest." Defendant replied by telegram, "Will accept your offer." Plaintiffs telegraphed to the defendant on the same day, "All right, we confirm two hundred as described. Would be glad if you can arrange to deliver Saturday or Monday. We will insure until Monday. Will this suit? Answer quick." To this the defendant answered by telegram, "Monday will suit best for delivery. Have two hundred thirty bales." Plaintiffs alleged, that, when they demanded delivery of the cotton, defendant refused to deliver it, and, on May 28, wrote plaintiffs a letter as follows: "I want to ask you to let me out of that sale. I

am very much worried about it. Now let me out, and I will give you the refusal of the sale of it later. It will be the greatest favor to me, and one that I will ever appreciate. Say nothing about it please." Plaintiffs did not accede to this request, and on the following day defendant sent to them two telegrams, the first saying, "I can not stand to trade; so let me out sure. Don't come." The second read, "Need not come Monday or Tuesday; trade off. Can't get cotton." Plaintiffs alleged that they had contracted to sell the cotton, and, by reason of the defendant's breach, had to go into the market and buy two hundred bales of cotton at seven and a half cents per pound, which was the market price on the day of the breach of the contract.

The defendant denied refusal to comply with his contract, or liability. He did not deny the correspondence set out by the plaintiff, though he said that he had not kept copies of his letters, and asked that the originals be produced. He alleged the following as the history of the transaction: On April 10, 1905, defendant wrote to one Boon in regard to the cotton market, prices, etc. Boon was not then the agent of the plaintiffs, so far as defendant knew. He delivered defendant's letters to the plaintiffs; whereupon the correspondence between the parties followed. When defendant wrote that "My cotton will grade Atlanta 3's," he had reference to cotton he represented, some of which belonged to defendant, and some to other parties. In the letter of April 25 he offered 230 bales of his individual cotton, the grade of which is described in that letter. This was the first act on his part offering to plaintiffs his individual lot of cotton, which consisted of 230 bales. He followed this with a telegram, asking for a bid on 200 bales of "good" cotton. Plaintiffs offered seven cents per pound on cars at Flovilla, which was accepted. Late in the afternoon of the same day the price of cotton declined, and plaintiffs telegraphed the defendant to meet the northbound train passing Flovilla that night. He had his agent to do so. One of the plaintiffs was on the train, and informed the agent of the defendant that their bid meant for all white cotton (meaning no tinges at all), that defendant should be so informed, and that any cotton with tinges would be rejected. Defendant's agent informed the plaintiff that unless he would take the 200 bales of cotton as a lot, the trade was "off." When this member of the plaintiff's firm and the agent of the defendant sep-

arated, each understood that the trade was "off;" and such trade was then and there mutually rescinded. After a further decline in the cotton market, the price began to rise, and reached a higher point than the market price was on April 26. It was then that plaintiffs began to contend for the cotton. Defendant offered nothing but 200 bales "good" cotton. His cotton was "good" cotton, and in good faith he sold it to plaintiffs, and would have delivered it to them had they not rescinded the trade, as above stated.

The jury found for the defendant. The plaintiffs moved for a new trial, which was refused, and they excepted.

*N. E. & W. A. Harris,* for plaintiffs.

*John R. L. Smith,* for defendant.

LUMPKIN, J. (After stating the foregoing facts.)

1. The defendant contracted to sell and deliver to the plaintiffs 200 bales of cotton. As the time for delivery approached he wrote and telegraphed to the plaintiffs, begging to be relieved from the trade, and then repudiating it. In one telegram he said, "I can not stand to trade." In another he said, "Trade off. Can't get cotton." Nevertheless he denied the allegation that he broke the contract or refused to deliver the cotton according to the contract; and the jury must have accepted his statement, as they found a verdict in his favor. He pleaded that there was a rescission of the contract on the same day on which it was made; but he introduced no evidence to sustain the plea. The case revolved mainly about two questions: (1) What kind of cotton did the defendant contract to deliver? (2) In spite of his letters and telegrams before the time specified for delivery, in regard to being released from the contract and declaring the trade off, when demand was made upon him by the agent of the plaintiffs, for compliance, at the time fixed therefor, did he fail and refuse to deliver cotton of the kind which he had contracted to deliver; or did he offer to deliver cotton of a different quality; or did he have and tender or offer to deliver the cotton contracted for, of the quality provided in the contract, and did the plaintiffs' agent decline it? The presiding judge erred in his rulings in regard to these two questions, and a new trial must result.

The telegrams closing the contract of sale referred to 200 bales of "good" cotton. The letter of the plaintiffs confirming their

telegram of acceptance referred to "two hundred as described." There was evidence tending to show that the expression "good cotton" included several grades indicated by numbers in the Atlanta market, or, as stated by a witness, "Atlanta 1's, 2's, 3's and 4's are all good cotton." The term "good cotton" was subject to parol explanation. While the meaning of the words, as ordinarily used in the cotton market, may have been as above indicated, yet if the parties, in dealing with a particular transaction in regard to the sale of certain cotton, used them as meaning a certain grade represented by one of the numbers in the Atlanta market, it was competent to show this. Or if the parties differed, and one of them placed a certain meaning upon the contract, and it was known to be thus understood by the other party, at the time, this would be held to be the true meaning. Civil Code, § 3674. One party can not lead the other to believe that a descriptive term means a certain thing, as used by him, and that the articles being sold measure up to that description, and then avoid the force of his contract by using a general term in a telegram, which might apply to the specific description already given, or might, standing alone, apply to an article of that description or one of inferior quality. In the first letter of the defendant to the plaintiffs, referring to a desire to sell them cotton, he referred to it as "good cotton," and said, "My cotton will grade Atlanta 3's." In his pleadings he set up that he did not mean his own cotton alone, but cotton which included some of his own and some of other persons represented by him ; but there was no evidence that he "represented" any other cotton than his own. It is true that this was a preliminary letter, and that no trade was closed until some days after its writing. Again, on April 25, he wrote to the plaintiffs to know if they would like to buy 230 bales of "good cotton all in fine condition," and on the next day telegraphed to them to name their best price for 200 bales of "good cotton." A ground of the motion for a new trial alleged that the plaintiffs offered to show by the testimony of one of them that the 230 bales of cotton mentioned in the negotiations constituted the only cotton which the defendant had, that the 200 which they bought were a part of the 230 bales, and that the plaintiffs relied upon the representations as to grade set out in the letter of April 17, and that of April 25, in making the trade. The evidence was rejected. In this we think the presiding

judge erred.  The defendant did not purport to be dealing as a cotton broker, or with regard to cotton which he expected to buy or obtain, but referred to a lot of cotton as "my cotton," and in the several letters and telegrams never indicated to the plaintiffs that he was selling them any other cotton.  In the correspondence he specified the quality of the cotton which he mentioned generally as "good cotton."  After the sending of these letters, when he followed that of April 25 with a telegram asking for an offer, there was ample evidence to authorize an inference that he would expect the plaintiffs to put upon the words "good cotton," as used in the transaction, a meaning corresponding with the description which he had given in his letters.  If so, and they did put that construction upon the general words in the telegram and acted thereon, the plaintiffs should have been allowed to prove it.

The decision in *Slater, Myers & Co.* v. *Demorest Spoke & Handle Co.,* 94 *Ga.* 687 (21 S. E. 715), is not in conflict, but rather in accord, with what is here said.  It held that a person could not write a letter plainly making a promise to do a certain thing, and, when such promise was sought to be enforced, be allowed to testify that he meant that he would do it on a certain contingency. *Armistead* v. *McGuire,* 46 *Ga.* 232.

2.  One ground of the motion for a new trial complained that the defendant was allowed to testify that one of the plaintiffs offered to take the cotton without classification, some two weeks after agents of the plaintiffs went to see the defendant about its delivery.  If this stood merely as an independent offer, it would be plainly inadmissible; but it appears that what was said was a part of a conversation between one of the plaintiffs and the defendant.  The defendant testified, "A week or such a matter afterwards Mr. Ford came up here, and we had a talk. . . Mr. Ford said, 'I don't know whether I bought the cotton based on Atlanta 3's or not.'  He said he needed the cotton and would take it. I replied, 'I don't think you will.  I tendered it to you twice. I don't intend for you to have it.'  Cotton had gone up in the meantime."  It will be seen from this quotation that the evidence to which objection was made was not introduced to show a separate and independent offer, but as a continuing discussion between the parties in regard to the quality of cotton sold, and accompanying an admission that the speaker did not know whether he had bought

it on the basis for which the plaintiffs contended. Taken in connection with its context, there was no error in this ruling.

3, 4. The court charged as follows: "The question is, whether or not Mr. Lawson delivered the cotton at the time and place stated, or whether he endeavored or offered to so deliver it." There was no evidence that the defendant delivered the cotton contracted for. A mere endeavor to comply with a contract is not alone a defense to an action for its breach. Nor was it accurate to state that the question was whether the defendant "offered to so deliver it" (i. e. "the cotton"). The expression "the cotton" might have been understood by the jury as referring to the cotton which the defendant had, regardless of whether it fulfilled the terms of the contract as to quality or not. It was the duty of the defendant, under his contract, to have, at the time and place of delivery agreed on, 200 bales of cotton of the quality which he contracted to deliver, and to deliver it to the plaintiffs, unless they refused to receive it. They had agents demanding of the defendant the cotton which he had contracted to deliver. He claimed that he offered to deliver his cotton, and that it met the requirements of the contract, but that plaintiffs' agent refused to receive it, unless it graded other than as required by the contract. If the defendant contracted to deliver 200 bales of a certain quality, and tendered cotton of a different quality, this would be no satisfaction of the contract nor furnish him any ground for release therefrom. The errors contained in this charge are repeated in several other charges to a greater or less extent.

It was contended that the defendant did not file a plea of tender, and that the charges touching a tender or offer to deliver the cotton should therefore not have been given. It was alleged by the plaintiffs that the defendant failed and refused to comply with his part of the contract. It was also alleged that plaintiffs were always and at all times willing and ready to perform their part of the contract, and to accept, receive, and pay for the cotton according to the agreement, but that the defendant refused to perform his part of such contract. These allegations were denied by the defendant. Evidence was introduced by the respective parties, tending to sustain the plaintiff's allegations, on the one side, and seeking, on the other, to show that the defendant had not refused to comply with his contract, but had offered to do so, and the plain-

tiffs' agent had refused to accept the cotton offered. It was proper to charge the jury on the issue thus made, although there was no formal plea of tender.

5. The court refused a request to charge the following: "If you believe that, prior to the date set for the delivery of the cotton, the defendant notified the plaintiffs that he would not perform the contract, there was a breach of the contract, and the plaintiffs' right of action accrued at that time," and also another request of similar import. This law is applicable to what is known as an anticipatory breach of a contract. The decisions in different States are not in harmony on that subject. This court, following the decisions in Hochster v. De la Tour, 2 El. & Bl. 678, and Roehm v. Horst, 178 U. S. 1 (20 Sup. Ct. 780, 44 L. ed. 953), has adopted the rule, that, after the renunciation by one party of a continuing contract, consisting of mutual obligations, the other party is at liberty either to immediately treat such renunciation as a breach of the contract and sue for any damages he has sustained by reason thereof, or to treat the contract as still binding, and wait until the time arrives for its performance, in order to give the party who has repudiated the contract an opportunity to comply with its terms. If he adopts the latter course, and at the time fixed for performance demands compliance on the part of the other party, his right of action for a breach depends on whether or not such compliance is then made. He can not adopt this method of procedure, allege a breach at the time fixed for performance, and yet rely for recovery on the anticipatory breach, if in fact the other party offered to perform in accordance with the terms of the contract at the time of his demand therefor. *Smith* v. *Georgia Loan, Savings and Banking Co.*, 113 *Ga.* 975 (39 S. E. 410) ; *Anderson* v. *Kirby*, 125 *Ga.* 62, 67 (54 S. E. 197, 114 Am. St. R. 185).

In another charge, as set out in the motion for a new trial, there appears to be an inaccuracy. In the general charge, this does not appear to exist. Except as above indicated, there was nothing in the motion for a new trial requiring a reversal.

*Judgment reversed. All the Justices concur.*