# HARDWOOD LUMBER COMPANY *v.* ADAM & STEINBRUGGE.

1. The general rule is that in a suit for breach of contract for failure to deliver goods of a certain quality sold at a specified price, the measure of damages is the difference between the contract price and the market price at the time and place of delivery.

2. This is not an inflexible rule in all cases, so as to exclude a recovery of actual damages sustained in cases to which such rule in its very nature is inapplicable; as, where there is no market at the time and place of delivery by which damages can be measured, and resort must be had to the nearest available market, with the cost of shipment to the place of delivery added.

3. If goods are bought for the purpose of resale, and so known to both parties, and upon failure of the seller to deliver there is no market in which the buyer can readily obtain them, he may go into the market and purchase the best substitute obtainable, using reasonable care and diligence, and charging the seller with the difference between the contract price of the goods and the price of the goods substituted.

4. In order to entitle the purchaser to recover full damages in such a case, he must have acted within a reasonable time, and have used due diligence to mitigate the loss.

5. The evidence was sufficient to authorize the charge of the judge and to sustain the finding of the jury, approved by the presiding judge.

6. If the seller of goods fails to deliver them according to the contract, and thereafter the purchaser urges delivery, and the seller promises to make it but fails to do so, this alone does not work such an extension of the contract as will prevent the purchaser from recovering damages on the basis of the original breach.

7. In such a case, if there is no market in which the articles sold can be readily bought, and within the knowledge of both parties they were bought for resale, and the purchaser buys the best substitute obtainable in order to fulfill his subcontract of sale, in determining the reasonableness of his conduct and of the time when he makes the purchase, the

conduct of the defendant in asking delay after the failure to deliver and promising to make delivery, may be considered.

8. When taken in connection with the entire charge, none of the excerpts of which complaint was made are such as to require a new trial.

July 15, 1910.

Complaint. Before Judge Hammond. Richmond superior court. March 6, 1909.

In May, 1906, the Hardwood Lumber Company, of this State, contracted to sell to Adam & Steinbrugge, of New Orleans, Louisiana, 75,000 feet of red gum lumber for July and August shipment. The correspondence between the parties showed that the lumber was bought for the purpose of resale, references being made in the letters of the purchasers to their customers. The first letter written by them, which was introduced in evidence, said: "If you would care to make us a price C. I. F. Rotterdam, and guarantee that our customers will get exactly what the B/L calls for, we believe that we could do some business with you." The lumber was not shipped at the time agreed upon. In October thereafter the plaintiffs began writing a series of letters to the defendants, urging the latter to deliver the lumber. The sellers replied by making various excuses, such as that the logs had to be gotten out of the swamp, that it had been raining so as to make it impossible to do so, and that the railroad did not furnish enough cars; and promising delivery at an early time. This correspondence of urgency on one side and excuses on the other continued for a number of months. On October 11, 1906, the purchasers wrote: "We sold this stock according to your contract with us; and if you don't deliver it, the customer that we sold it to will certainly hold us up for indemnity so much per M. feet, in which event we will put the matter up to you. Please let us know if you know of some place where you could buy this stock?" In its reply the seller said: "We know of no place where we can place this order. If we could find some one to take it, we do not think they could get it out any quicker than we will. We will make delivery just as soon as possible." On December 10, the purchasers wrote: "If you can not give us any definite information in regard to delivery of this stock, we must go out and buy it somewhere else; and if there is any difference in price, we would expect you to help us out." On January 30, 1907, they again wrote: "We really do not know how we can make our customers wait any longer; they simply must have the stock, and they will not

accept the excuse you give us, and threaten to buy the stock on the open market, charging us up with the difference." On February 21, 1907 the purchaser wrote: "We wish to advise you that inasmuch as you have made no efforts, apparently, to get this stock for us, this letter will serve to advise you that, if you will not have delivered this stock by the first of May, we will buy what is due on the open market, or allow you the privilege of doing it." The sellers replied: "We have yours of the 21st, with reference to extending the time of delivery of the red gum sold you to the first of May. We will use our best endeavors to get the lumber ready for shipment by that time. We are anxious to fill your order, and regret that conditions have been such that we have been unable to do it. We intend to do it, and if you just have patience you will get the lumber all right." The purchasers continued to write letters urging the delivery of the lumber until November, 1907. On October 21 they informed the seller that, if the latter did not deliver the lumber immediately, the purchasers would at once bring suit for the breach of contract. They added: "We have secured at different times gum lumber at considerably higher prices than we paid you to deliver our contracts that we made based on getting the stock from you." The seller finally wrote, November 9, 1907, saying: "It is useless for us to promise to make delivery of this stock within the next thirty days. . . We have always intended to deliver this stock as we told you before; but if you think that you can get your money quicker by bringing suit against us, it is a matter for you to decide. We have told you before we regretted this delay, but it is impossible to prevent it."

The purchasers brought suit, alleging that they had been compelled to buy red gum lumber to fill their contracts at a higher price than that at which they purchased, and had incurred the expense of transportation, which the seller agreed to pay, making an aggregate difference of $441.78. They recovered a verdict for the full amount. A motion for a new trial was overruled, and the defendant excepted.

*William H. Fleming,* for plaintiff in error.

*Samuel H. Myers* and *George T. Jackson,* contra.

LUMPKIN, J. (After stating the foregoing facts.) The defendant did not deny that it broke the contract, and never delivered the red gum lumber sold. The only question was as to the measure of

damages. The plaintiffs contended that they were entitled to recover the difference between the cost of lumber which they had purchased in this country and had shipped to Europe, in order to meet the contracts which they had made on the faith of the contract with the defendant, and the price at which the lumber was sold to them, with cost of delivery at Rotterdam, in accordance with the contract with the defendant. The latter claimed, that there was no sufficient evidence to show that there was not a market at Rotterdam in which the lumber could have been procured; that the date of the breach was either in July and August, 1906, or in November, 1907, and that the purchases made by the plaintiffs were between those dates; that the proper measure of damages was the difference between the contract price and the market price at the time and place fixed for delivery; and that, in the absence of sufficient evidence to show this difference, only nominal damages could be recovered. Various exceptions were made to charges and refusals to charge, but they all referred to the measure of damages, and need not be stated in detail.

Damages are given as compensation for the injury done. "Damages recoverable for a breach of contract are such as arise naturally and according to the usual course of things from such breach, and such as the parties contemplated when the contract was made, as the probable result of its breach." Civil Code, § 3799. "Any necessary expenses which one of two contracting parties incurs in complying with the contract may be recovered as damages." § 3806. One injured by a breach of contract is bound to lessen the damages as far as practicable by the use of ordinary care and diligence. § 3802. In a suit for breach of contract for failure to deliver goods of a stated quality sold at a specified price, the general rule is that the measure of damages is the difference between the contract price and the market price at the time and place fixed for delivery. If there is no market at the place of delivery at the time fixed therefor, resort may be had to the nearest available market, with cost of transportation to the place of delivery usually added. *Ford* v. *Lawson*, 133 *Ga.* 237 (6), 238 (65 S. E. 444.) It is evident that the general rule can not be taken as a Procrustean one, subject to no exception or modification. If so, it would exclude the possibility of recovering profits, where in contemplation of the parties at the time of the contract. If there should be no market

at the time and place fixed for delivery, the seller breaking his contract could not escape liability for actual damages, on that account. The article sold may be such as requires to be manufactured, and such as is not ordinarily carried in the market for sale. *Sizer* v. *Melton*, 129 *Ga.* 143 (7), (8), 151 (58 S. E. 1055).

In 2 Benjamin on Sales (6th Am. ed.), § 1327, after reviewing a number of cases, the author states as follows: "It is submitted that these decisions establish the following rules in cases where goods have been bought for the purpose of resale, and there is no market in which the buyer can readily obtain them:—I. If at the time of the sale the existence of a subcontract is made known to the seller, the buyer, on the seller's default in delivering goods, has two courses open to him:— (1) He may elect to fulfill his subcontract, and for that purpose go into the market and purchase the best substitute obtainable, charging the seller with the difference between the contract price of the goods and the price of the goods substituted. (2) He may elect to abandon his subcontract, and in that case he may recover as damages against the seller (*a*) his loss of profits on the subsale, and (*b*) any penalties he may be liable to pay for breach of his subcontract; but if the amount of the penalties has not been made known to the seller, the buyer is not entitled to recover their amount as a matter of right, but the jury may, if the penalties are reasonable, assess the damages at that amount. It is further submitted, that, in order to entitle the buyer to claim exceptional profits arising from a subsale, express notice of the amount of such profits must have been given to seller at the time when the contract was made, under circumstances implying that he accepted the contract with the special condition attached to it. II. If at the time of the sale the existence of a subcontract is not made known to the seller, a knowledge on his part that the buyer is purchasing with the general intention to resell, or notice of the subcontract given to him subsequent to the date of the contract, will not render him liable for the buyer's loss of profits on such subcontract; the buyer may either procure the best substitute for the goods as before, and fulfill his subcontract, charging the seller with the difference in price, or abandon the subcontract and bring his action for damages, when the ordinary rule, it would seem, will apply, and the jury must estimate, as well as they can, the difference between the contract price and the market value of the goods,

although there is no market price in the sense that there is no place where the buyer can readily procure the goods contracted for. III. In every case the buyer, to entitle him to recover the full amount of damages, must have acted throughout as a reasonable man of business, and done all in his power to mitigate the loss."

According to the seller's letters in this case, the timber from which it was to be sawed had to be gotten out of the swamps where it grew. After the failure to deliver in accordance with the contract, the purchasers made this request of the seller: "Please let us know if you know of some place where you could buy this stock?" To this the seller replied: "We know of no place where we can place this order." The agent of the purchasers testified that "their default had forced us to enter the open market for the purchase of lumber wherever we could get it, and to meet obligations we had assumed when we supposed that the Hardwood Lumber Company was going to fulfill their contract." It is true that the agent testified that the lumber bought to fill the contracts of the purchasers, as indicated in an exhibit to their petition, was bought after November 9, 1907. He, however, testified to the items of the account. The bills of lading introduced in evidence indicated that the purchases were in fact made after the time provided in the contract for delivery, but before the date mentioned by him. After the breach occurred, the plaintiffs again and again urged the defendant to ship the lumber, and informed the latter that it had been sold to customers who insisted on having their contracts filled; and the plaintiffs threatened to hold the defendant liable if its contract of sale was not complied with promptly. The seller made excuses and various indefinite promises to make the shipment at an early date, until November, 1907, when the patience of the plaintiffs was exhausted, and they brought suit.

After a contract of sale of goods is broken by failure to deliver, the mere fact that the purchaser is willing, by way of voluntary forbearance, to waive the delay and receive the property sold, and urges delivery, does not operate as a waiver of the legal damages incurred by him, if there is no extension for a consideration and no compliance or tender of compliance on the part of the person in default. He can not repudiate his contract, and be relieved from damages for its breach because he was urged to comply with it. This case presents no question of request for delay in performance

and grant thereof before breach or pending delivery in installments.

After a complete breach of contract on the part of the seller to deliver the goods sold, if they are of a kind not readily obtainable in the market, and if the seller undertakes to procure the best substitute he can to fill his contract of resale, for which purpose both parties knew that the goods were bought, the purchaser must act within a reasonable time and with reasonable diligence. In determining whether he does so or not, the conduct of the seller tending to cause some delay in action may be considered. The presiding judge charged, on this subject, as follows: "I charge you that the plaintiff is only bound to exercise good business judgment and reasonable diligence in the matter of repurchasing the lumber, and would not be bound to purchase all in one lot, if he exercised good faith and reasonable business ability as a reasonably good business man would exercise under the circumstances." While generally the measure of damages is to be fixed at the time of the breach of the contract, it can not be said as matter of law, under the conduct of the seller and its repeated assurance of early shipments and requests for delay, that the purchasers were bound to purchase the entire lumber immediately. Indeed, it might be inferred from the evidence that they could not do so, but that they did the best they could to remedy the default of the seller and save themselves from damages as far as possible on account of their resales. There are some decisions which go further than this charge, and hold that if the purchaser waits until a certain time, at the request of the seller, and then purchases goods to meet his subcontract of sale, the seller can not complain. On the subject of delay induced by the party in default see *Mendel* v. *Miller*, 126 *Ga.* 834 (56 S. E. 88, 7 L. R. A. (N. S.) 1184).

Upon a careful consideration of the entire record, we do not think this a case of nominal damages. While there is some conflict in the testimony introduced by the plaintiffs as to the dates of the purchases made by them after the defendant's default, and as to whether the specific purchases made were rendered necessary by such default, there was sufficient evidence to authorize the finding of the jury in favor of the plaintiffs. Nor do any of the grounds of the motion for a new trial, when considered in the light of the entire evidence and the charge of the court, require a reversal. As

showing the general rule and certain modifications of it both in England and America see:. Ogle v. Vane, L. R. 2 Q.B. 272 (dealing both with the question of the statute of frauds and delay, not as a new contract, but as a voluntary forbearance) ; Barrow v. Arnaud, 8 Q. B. 595, 601; Loder v. Kekulé, 3 C. B. N. S. (91 E. C. L.) 126 ; Hinde v. Liddell, 10 L. R. Q. B. 265 ; Borries v. Hutchinson, 18 C. B. (114 E. C. L.) 445 ; Hickman v. Haynes, 10 L. R. C. P. 595 ; 2 Joyce on Damages, §§ 1625, 1626 ; 3 Sutherland on Damages, 652; Vickery v. McCormick, 117 Ind. 594 (20 N. E. 495) ; Haskell v. Hunter, 23 Mich. 305 ; Watson v. Kirby, 112 Ala. 436 (20 So. 624 (6)) ; Paine v. Sherwood, 21 Minn. 225 ; Thomas Iron Co. v. Jackson Iron Co., 131 Mich. 130 (91 N. W. 137) ; Den Bleyker v. Gaston, 97 Mich. 354 (56 N. W. 763).

*Judgment affirmed. All the Justices concur.*