### 12181.   GARCIA S. en C. *v.* TAGGART COAL COMPANY.

1. When the sufficiency of a petition is not challenged by a demurrer or a motion to strike, and the plaintiff offers evidence which proves, or tends to prove, any allegation in the petition, it is error for the court to reject the evidence on the ground that it is irrelevant and immaterial.

2. Where it is known to both parties to a contract for the sale of goods, at the time of the execution of the contract, that the goods are being bought for the purpose of resale, and the seller subsequently breaches the contract by failing to deliver the goods within the time designated in the contract, and there is no available market in which the buyer can readily obtain the same quality of goods, the buyer, in order to charge the seller with the difference between the contract price of the goods and the price of the substitute goods — bought by the buyer after the contract was breached — with cost of transportation to the place of delivery named in the contract, must purchase the best substitute obtainable, using reasonable care and diligence, and *ordinarily* must buy them in the nearest available market. However, this rule (as to buying in the nearest available market) is based solely upon the ground that the buyer must lessen his damages as much as possible, and it obviously does not apply in a case where the buyer goes to a market other than the nearest available one, and purchases there *as good* a substitute, and *as cheaply*, as he could have bought in the nearest available market, *and where the cost of transportation is no more than it would have been if the goods had been bought in the nearest available market.*

3. The petition set out a cause of action; and, under the evidence adduced, a verdict for the defendant was not demanded. The court therefore erred in directing a verdict in favor of that party.

DECIDED JUNE 17, 1921. REHEARING DENIED JUNE 30, 1921.

Action for breach of contract; from city court of Savannah — Judge Freeman. November 26, 1920.

The contract sued on in this case is contained in a letter from the plaintiff to the defendant company, dated April 22, 1918, and accepted April 24, 1918, which reads as follows: "We are pleased to confirm by the present our closing with you through Mr. R. P. Lopez for 10,000 tons of High Volatile Coal, similar more or less to Westmoreland, for delivery by barges at the ports of Sagua la Grande or Caibarien [Cuba], in accord with our instructions at the price of $13.75 per ton of 2,240 pounds, cost, freight and insurance. Delivery to be made during the months of July to November, 1918, inclusive, it being understood that you will undertake by every possible means to make a proportionate delivery of the entire quantity in each month commencing in July next and finishing in November next. We are to have the privilege on our part of increasing this contract to a maximum of 20,000 tons under the same conditions as applicable to the first 10,000 tons, and which option is to be open to us until the 15th of June, 1918, inclusive. We shall be allowed for the discharge of each barge the time required for tugs to run from port of discharge light to Key West and return to port in Cuba with another barge load, and which time is estimated to be about four days, but in any event we guarantee to take the cargo out as fast as the vessels can deliver same. Payment is to be made 30 days after date of barges clearance for Cuba, or, if preferable to you, by drafts at 30 days' date of clearance of vessels, payable in this city [New York]. In confirmation of this transaction we will appreciate very much returning to us the enclosed duplicate copy of this present letter duly accepted by you and which we require for our files."

The petition alleged, among other things, the following facts: "that at the time said contract was made said defendant company well knew that petitioner was engaged in the business of purchasing coal for resale to sugar mills in Cuba who required all of their supplies by December 1st in each year for use during the grinding season beginning soon thereafter; and before said

contract was reduced to writing Mr. R. P. Lopez, who is referred to in said contract and who negotiated the purchase of said coal, notified said defendant company that petitioner was purchasing said coal for the purpose aforesaid; that said defendant company failed to make a single delivery of coal under said contract until the month of November of said year; that during the time limit of said contract petitioner repeatedly urged said defendant company to provide means for delivering the 10,000 tons of coal sold to it; that it offered to said defendant company a Cuban tugboat and a fleet of barges which could be chartered from Domingo Nazabal of Cienfuegos, Cuba, which offer was refused; and that it requested said defendant company to divert some of the coal which it was shipping to Havana, Cuba, to the ports of Sagua la Grande and Caibarien, which request was likewise refused; that during the month of October, 1918, said defendant company authorized petitioner to charter for defendant's account from the Sugar Products Company of New York City a small steamer, the " Hopper," and several barges to be used in delivering as much coal as possible under said contract from Key West, Florida, to said Cuban ports; but by reason of the fact that said defendant company failed to assemble coal in sufficient quantities at Key West, only 978 tons of coal were delivered by this means during the remainder of the contract time. The petition contained various letters and telegrams sent by the plaintiffs to the defendant company during the life of the contract, urging and demanding deliveries of the coal purchased, and re-notifying the defendant of the purpose for which the coal was bought. The petition further alleged that the defendant company failed to deliver within the contract time 7445 tons of the coal purchased; that the market price of coal, similar more or less to Westmoreland, at Sagua la Grande and at Caibarien on November 30th, 1918, was $18 per ton; but petitioner was unable to purchase all of the coal remaining undelivered by said defendant company, in sufficient quantities for immediate delivery, in any Cuban market, and was compelled to purchase the greater portion of said coal in the markets of the United States and to deliver it by steamers at said Cuban ports; that " in order to make prompt deliveries of coal to its customers in Cuba, petitioner · purchased and transported from

Newport News, Virginia, to Caibarien, Cuba, by the steamship 'Ottar' 1937 tons of coal at a total cost, including the purchase-price, freight and insurance, of $31,928.36; that it purchased and transported from Newport News to Caibarien by the steamship 'Nicholas Cuneo' 827 tons of coal at a total cost, including the purchase-price, freight and insurance, of $13,371.30; that it purchased and transported from Newport News to Sagua la Grande by the steamship 'Thyra S.' 1603 tons of coal at a total cost, including the purchase-price, freight and insurance, of $25,080.88; that it purchased and transported from Newport News to Caibarien by the steamship 'Adonis,' 1955 tons of coal at a total cost, including the purchase-price, freight and insurance, of $32,119.13; and that it purchased at Sagua la Grande, Cuba, 1123 tons of coal at $18.00 per ton, or at a total cost of $20,214.00; making a total of 7445 tons so purchased for the purpose of replacing non-deliveries by said defendant company at a total cost of $122,713.67;" that "for the purpose of moving said coal from Newport News to Cuba petitioner was compelled to charter from the Munson Steamship Line, as agents for the United States Shipping Board Emergency Fleet Corporation, the steamships 'Ottar' and 'Adonis,' and from the Atlantic Fruit Company of New York, the steamship 'Nicholas Cuneo;' and was required in the case of each steamship so chartered to make and execute a Charter Party," containing provisions for demurrage; that "although each cargo was loaded and discharged as fast as the port facilities at Newport News and Caibarien would permit," petitioner "incurred and became liable to pay demurrage bills aggregating the sum of $11,555.11." Attached to the petition as an exhibit was an itemized statement of each demurrage bill. The petition further alleged that "by reason of the failure of said defendant company to deliver 7445 tons of the coal purchased from it, in accordance with the terms of the contract, petitioner sustained an actual loss and damage of $31,900.03." A statement of petitioner's alleged damages was attached to the petition as an exhibit. By way of amendment petitioner alleged that "all of the coal, purchased as aforesaid, was of the kind described in petitioner's contract with said defendant company, except the cargoes shipped on the steamers Ottar and Adonis, which were New River coals once screened, a very lumpy coal, and the best sub-

stitute to be found in the market at the time said cargoes were respectively purchased; that said coal was purchased at the lowest prices obtainable for immediate delivery, and that the whole amount was delivered in Cuba by January 20, 1919, at the smallest cost and expense possible."

The defendant filed an answer admitting the contract but denying any liability thereunder, and denying that the defendant was notified at the time the contract was made that the coal was being purchased for the purpose of resale. The defendant admitted also that it had failed to deliver within the contract time 7445 tons of the coal purchased from it, but alleged that deliveries were made after the contract time with the full knowledge and consent of the plaintiff; also that if the plaintiff purchased and transported coal from Newport News, Virginia, as stated in the petition, the same was not done under any contract with the defendant, and the defendant is not responsible therefor, and that the defendant was given no notice of what the plaintiff proposed to do and no opportunity for furnishing the coal called for by the contract. By an amendment to the answer the defendant expressly denied that it was liable for any of the damages or expenses set out in the petition or that any of them were collectable, even if the damages were sustained and the expenses incurred.

No demurrer, either general or special, was interposed; and the court, after excluding certain evidence offered by the plaintiff, directed a verdict for the defendant, the court saying to the jury: "I have had a great deal of difficulty in coming finally to a conclusion as to the law of this case. It has interested me a great deal, the arguments were illuminating, and the respective positions of the parties forcefully presented. I have given to it every moment of available time since you were discharged on Wednesday, and I have finally come to the conclusion to charge you as per the first request of the defendant in the case; that is to say, that *in view of the pleadings and the law* [italics ours] the court directs the jury to find in favor of the defendant; and I will ask Judge Adams to enter a verdict to that effect." To this judgment the plaintiff excepted, and assigned error upon the rejection of the proffered testimony, and also upon the direction of the verdict. In order to avoid repetition, the material evidence excluded by the court, as well as that admitted, is not

set forth in this statement of facts, but will be found stated in the following opinion.

*Hitch, Denmark & Lovett,* for plaintiff.

*Adams & Adams,* for defendant.

BROYLES, C. J. (After stating the foregoing facts.) The plaintiff in error contends that under the ruling in the case of *Hardwood Lumber Co.* v. *Adam,* 134 *Ga.* 821 (68 S. E. 725, 32 L. R. A. (N. S.) 192), the petition set forth a cause of action, whereas the defendant in error contends that, under the ruling of this court in *Twin City Lumber Co.* v. *Daniels,* 22 *Ga. App.* 578 (96 S. E. 437), it did not. In each of these cases the decision is well considered and ably written, but, when carefully compared, the decisions are not at all conflicting. The *Hardwood Lumber Co.* case was a suit for the breach of a contract for the failure to deliver a specified quality of lumber, the plaintiffs alleging that the defendant had notice at the time the contract was made that the lumber in question was purchased for the purpose of resale, and that, by reason of the defendant's breach of the contract, they were compelled to buy lumber to fill their subcontract at a higher price than that at which they had purchased it from the defendant, and sought to recover as damages the difference between the contract price of the lumber and the price they were forced to pay for it, plus the expense of transportation. They recovered the full amount sued for, a motion for a new trial was overruled, and the defendant excepted, contending that the proper measure of damages was the difference between the contract price and the market price at the time and place fixed for delivery. The Supreme Court affirmed the judgment of the trial court, the 1st, 2d and 3d headnotes of the decision being as follows: " The *general rule* is that in a suit for breach of contract for failure to deliver goods of a certain quality sold at a specified price, the measure of damages is the difference between the contract price and the market price at the time and place of delivery. This is not an inflexible rule in all cases, so as to exclude a recovery of actual damages sustained in cases to which such rule in its very nature is inapplicable; as, where there is no market at the time and place of delivery by which damages can be measured, and resort must be had to the nearest available market, with the cost of shipment to the place of de-

livery added. If goods are bought *for the purpose of resale, and so known to both parties,* and upon failure of the seller to deliver there is no market *in which the buyer can readily obtain them,* he may go into the market and purchase the best substitute obtainable, using reasonable care and diligence, and charging the seller with the difference between the contract price of the goods and the price of the goods substituted." (Italics ours.) In discussing these principles, Justice Lumpkin, who delivered the opinion for the court, said: " Damages are given as compensation for the injury done. ' Damages recoverable for a breach of contract are such as arise naturally and according to the usual course of things from such breach, and such as the parties contemplated when the contract was made, as the probable result of its breach.' Civil Code, § 3799 [Civil Code of 1910, § 4395]. ' Any necessary expenses which one of two contracting parties incurs in complying with the contract may be recovered as damages.' § 3806 [Civil Code of 1910, § 4402]. One injured by a breach of contract is bound to lessen the damages as far as practicable by the use of ordinary care and diligence. § 3802 [Civil Code of 1910, § 4398]." After stating the general rule already quoted from the headnotes, the opinion proceeds as follows: " It is evident that the general rule cannot be taken as a Procrustean one, subject to no exception or modification. If so, it would exclude the possibility of recovering profits, where [which were] in contemplation of the parties at the time of the contract." The court in that case quoted with approval and evidently based its decision upon Mr. Benjamin's statement of the rule (2 Benjamin on Sales (6th Am. ed.), § 1327), which is in part as follows: " If at the time of the sale the existence of a subcontract is made known to the seller, the buyer, on the seller's default in delivering goods, has two courses open to him: (1) He may elect to fulfill his subcontract, and for that purpose go into the market and purchase the best substitute obtainable, charging the seller with the difference between the contract price of the goods and the price of the goods substituted. (2) He may elect to abandon his subcontract, and in that case he may recover as damages against the seller (*a*) his loss of profits on the subsale, and (*b*) any penalties he may be liable to pay for breach of his subcontract. . . If at the time of the sale the existence of a subcon-

tract is not made known to the seller, a knowledge on his part that the buyer is purchasing with the general intention to resell, or *notice of the subcontract given to him subsequent to the date of the contract,* will not render him liable for the buyer's loss of profits on such subcontract; *the buyer may either procure the best substitute for the goods as before, and fulfill his subcontract, charging the seller with the difference in price,* or abandon the subcontract and bring his action for damages, when the ordinary rule, it would seem, will apply. . . In every case the buyer, to entitle him to recover the full amount of damages, must have acted throughout as a reasonable man of business, and done all in his power to mitigate the loss." (Italics ours.)

How stands the instant case in comparison with the *Hardwood Lumber Co.* case? The allegations of the present petition were sufficient to make a case for actual damages sustained by reason of the defendant's breach of its contract, to wit: the difference between the contract price and the price of the coal purchased by the plaintiff in order to carry out the subcontract, plus the cost of freight, demurrage, and insurance. The petition alleges (and in determining whether a cause of action was set forth the allegations must be treated as true) that at the time the contract was made the defendant well knew that the plaintiff was engaged in the business of purchasing coal for resale to sugar-mills in Cuba which required all of their supplies by the 1st of December, and that R. P. Lopez, who is referred to in the contract and who negotiated the purchase of the coal, notified the defendant, before the contract was reduced to writing, that the plaintiff was buying the coal for the specific purpose of resale. We are therefore constrained to hold that the petition set forth a cause of action under the *exception* to the general rule announced in the *Hardwood Lumber Co.* case, supra.

As to the case of *Twin City Lumber Co.* v. *Daniels,* supra, it is clearly distinguishable from the *Hardwood Lumber Co.* case and the case sub judice. In fact, Judge Bloodworth, who wrote the decision in that case for the court, not only recognized the binding force of the *Hardwood Lumber Co.* case, but took occasion to differentiate it. He said: " The plaintiff in error relies largely on the case of *Hardwood Lumber Co.* v. *Adam,* supra. That case is easily differentiated from the instant one. There

the seller had knowledge at the time of the execution of the con-
tract, and at the time of each extension thereof, that the lumber
was purchased *for the purpose of resale.* The petition in this case
does not disclose such a condition." (Italics ours.)  The case
of *Sanders, Swann & Co.* v. *Allen,* 124 *Ga.* 684 (52 S. E. 884),
is also easily differentiated from the case under review, since it is
stated in that case that "it was not alleged or shown that the
defendants had any notice that the cotton they contracted to sell
the plaintiffs had been resold by them."

Having seen that the petition set forth a cause of action, and
that, therefore, the court erred in directing a verdict for the de-
fendant, "in view of the pleadings and the law," we must next
consider whether or not the verdict directed was demanded under
the evidence; for if the ruling of the court was correct for any
reason, it should be affirmed. This calls upon us to first deter-
mine, whether certain evidence offered by the plaintiff was errone-
ously rejected. We think it was. The legal sufficiency of the
plaintiffs' petition was not challenged by demurrer or a motion
in the nature thereof, and "it cannot be at this time even a
matter of slight doubt that a plaintiff is entitled to prove every-
thing he alleges in a petition upon which he is permitted to go to
trial without objection on the part of the defendant, either to its
form or its substance." *Mayor &c. of Macon* v. *Melton,* 115 *Ga.*
153 (41 S. E. 499). The depositions of F. H. Rhol tended to
establish material allegations of the petition, and were therefore
improperly rejected. This witness testified, by depositions, as to
the quantity of coal purchased by the plaintiff, after the breach
of the contract, at Newport News, and its cost, including the
purchase-price, freight and insurance; also that high volatile
coal is of a lumpier nature than low volatile coal, and that two
of the cargoes were high volatile coal, similar more or less to
"Westmoreland" coal, and that the two other cargoes "were
New River coals, once screened, also very lumpy," and "came at
that time nearest to anything to Westmoreland that we could
find in the market;" also that "at the time the sales were made
the United States Government had established the prices for
export coal. . . and the price charges there were . . tide-
water prices. I don't think Marcelino Garcia S. en C. *could
have purchased this coal at a lower price.* I don't think so *as the*

*prices at that given period were established by the United States Fuel Administration. . . Those prices were absolutely in vogue at the time of these sales.* We had to be thoroughly familiar with the prices of coal at that time. . . There was a great shortness of coal and I doubt very much if Garcia could have bought any coal in Cuba at that time. I was familiar with the transportation rates of coal from the United States of America to Cuban ports and particularly ports of Caibarien and Sagua la Grande at that time. . . *The rate was the same from every American port to these Cuban ports."* (Italics ours.) • As to the charter parties referred to in the petition, this witness testified: "There was a uniform charter party as approved by the joint committee of the West Indies transportation of the United States Shipping Board and United States Fuel Administration, covering those clauses, and all charter parties made under that form carried the demurrage and dispatch clause as expressed therein, namely, 48 cents per gross registered ton per day, and 16 cents per gross registered ton per day dispatched, the steamer to discharge at the rate of 300 tons per running day, Sundays and holidays excepted, except in the case when a steamer was under demurrage." This witness testified also, on cross-examination, that all restrictions by the Shipping Board and fixed rates that he had mentioned applied *" to all tonnage, whether they were barges or steamers."* (Italics ours.) (It will be recalled that the contract called for the shipment of the coal by barges.) The rejected testimony of Carlos Garcia also tended to establish material allegations of the plaintiff's petition, and was likewise erroneously excluded. This witness offered to testify as follows: "I made these purchases of coal for quick delivery to the sugar mills in Cuba to replace the coal that the Taggart Coal Company had failed to deliver to us. The necessity at the time of making purchases for immediate delivery at Sagua la Grande or Caibarien was that we were at the beginning of December already and we were continuously receiving cables from our clients in Cuba, the sugar mills, stating that if they did not receive the coal during December at the latest, since it was already delayed, that they would make us responsible for their losses. I made efforts to buy this coal from others. . . I could secure nothing for immediate shipment. I purchased the New River coal that these invoices

called for *because this was the only coal available for immediate delivery.* The quality is very similar to the coal specified in our contract with Taggart. . . There is only a difference in price of $ .289 per ton. . . . I did not hesitate in buying that coal. . . The coal was accepted by the sugar mills." (Italics ours.) The rejected interrogatories of W. W. Houston also clearly tended to establish material allegations of the petition, and were therefore erroneously excluded. This witness's testimony related to the quantity of coal loaded on each steamer, and also furnished facts and figures as to the cost of loading each steamer, necessary to compute demurrage charges. The same is true of the rejected interrogatories of Arturo Alfonso Acosta, whose testimony related to and tended to establish the allegations of the petition as to the quantity of coal unloaded by the plaintiff in Cuba, and furnished facts and figures necessary to compute demurrage charges. The certified copies of the four charter parties were likewise erroneously excluded, since this documentary evidence contained the freight rate on coal from Newport News to the Cuban ports, etc.

The following evidence was admitted: R. P. Lopez, a witness for the plaintiff, testified: "I know the plaintiffs and defendant in this case. I am the Mr. R. P. Lopez who is mentioned in the contract involved in this case. At the time of my negotiations with the Taggart Coal Company and *before this contract was reduced to writing and signed,* I had a conversation with Mr. Grant Taggart, president of the company, in regard to the time limit of the contract and as to why the time limit should be fixed as between July and November, inclusive. I told him that the contract had to be fulfilled in all its terms; of course must have the coal there on time on account of *it has to be received by the sugar mills.* I made statement to him as to purpose for which this coal was to be purchased, that it was *for the sugar mills in Cuba* and that they had to deliver them on time." (Italics ours.) This evidence tended to support the allegation of the petition, that the defendant had notice at the time the contract was made that the coal in question was purchased for resale. So also the following telegram from the defendant to the plaintiff, which was introduced in evidence, tended to establish that such notice was given the defendant: "It is believed freight rate advanced

by government will be as high as eighty cents per ton. There-
fore we advise regarding your option ten thousand tons you *in-
clude this in your selling price* as you have not yet effected same
not having declared your option with us." (Italics ours.)

The jury were authorized to find from the above evidence that
the defendant knew when the contract was made that the coal was
the subject of resale.

It will be recalled that one of the defenses set up in the de-
fendant's plea was that the plaintiff received, under the contract,
all the coal delivered to the plaintiff, regardless of time. The
evidence as to this shows that the first deliverance of coal under
the contract was on November 2, 1918, the shipment being from
Savannah, Georgia, on the barge "Benefactor," and constituted
709 tons. The defendant also shipped to the plaintiff, during
the latter part of November, 1918, two more cargoes of coal,
amounting to 620 tons. These were the only deliverances of coal
prior to the expiration of the contract. It is true that several
shipments were made by defendant and accepted by the plaintiff
after the expiration of the contract, but the parties specifically
agreed that these shipments should not prejudice any claim of
the plaintiff for delayed deliveries or non-deliveries. In this
connection the record shows the following documentary and oral
testimony: Telegram from plaintiff to defendant, dated Decem-
ber 4, 1918: "Informed that barge number four did not sail
from Key West and was discharged and is repairing there. Sugar
Products Company proposed shipping portion discharged cargo
by Hopper and balance by barge. Do you agree to this? Wire
answer immediately. If cargo so shipped within five days from
date will accept draft for purchase-price of cargo. *This is with-
out prejudice to our claims under contract for non-deliveries and
delayed deliveries.*" (Italics ours.) To this telegram the de-
fendant replied: "We agree to handling of delayed cargo barge
number four as indicated in your wire," etc. The only other
shipment of coal after the expiration of the contract was made on
or about December 2, 1918, and, as will be seen from the follow-
ing evidence, was received by the plaintiff with the express under-
standing that its acceptance would be without prejudice to the
plaintiff's claim for damages: Telegram from defendant to
plaintiff: "Expect barge Savannah finished loading Friday.

Waiting your reply to our day letter of yesterday." Plaintiff replied: "To avoid delay will accept draft now on way for selling price 350 tons steamer Hopper. Wire consent to such partial acceptance. Will accept further draft for price of 500 tons upon clearance of barge number four from Key West if cleared within five days from date. Will accept draft for selling price cargo barge Savannah upon clearance if cleared within five days from date. *This is without prejudice to our claim for non-deliveries or for delayed deliveries."* (Italics ours.)

As to the conversation between the president of the defendant company and the plaintiff's New York representative, set forth in the record, and which the defendant insists showed that the plaintiff agreed after the expiration of the contract to accept the balance of the coal, and that an estoppel in favor of the defendant resulted therefrom because the defendant acted on the agreement to its hurt: conceding, but not deciding, that the New York representative of the plaintiff had authority to make such an agreement, it is sufficient to say that the evidence was in sharp conflict, and did not demand a finding in favor of the defendant, upon this point, either as to the fact of the agreement, or that the defendant acted upon the alleged agreement to *its hurt,* since the undisputed evidence showed that it had purchased the tug "Condon" before the alleged understanding with the plaintiffs.

There was also evidence introduced to show that the defendant had a large supply of coal, approximately 5000 tons, in Key West during the summer or early fall of 1918, which, instead of being shipped to the plaintiffs, was sold to others. There was also evidence tending to show that the defendant's supply of coal at Key West on November 30, 1918, was exhausted. In support of the allegation that the plaintiff was unable to purchase in a Cuban market all of the coal remaining undelivered in sufficient quantities for immediate delivery, the plaintiff introduced C. F. Iglesas, a Cuban coal dealer, who testified: "I have been in the business of buying and selling coal in the Cuban market since 1910. As to what is the trade meaning of the expression high volatile coal, similar more or less to Westmoreland: I only know two classes of coal handled in Cuba, fine or lumpy. Westmoreland is a lumpy coal. I was familar with the market price of

coal at Sagua la Grande on November 30, 1918. The market price of high volatile coal, similar more or less to Westmoreland, at Sagua la Grande on November 30, 1918, was about $20.00 per ton. I do not know what was the market price of the same kind of coal at Caibarien on November 30, 1918. My firm did sell to Marcelino Garcia S. en C. on November 30, 1918, 250 tons of coal at $18.00 per ton. It was impossible to have purchased as much as 7445 tons of high volatile coal, similar more or less to Westmoreland, in any Cuban market for immediate delivery at Sagua la Grande or Caibarien on or about November 30, 1918." This witness was corroborated in all material particulars by the witness Fitzgibbon, another coal dealer of Cuba. In this connection Marcelino Garcia, the active partner of the plaintiff firm, testified as follows: " As to my experience in buying and selling coal in Cuba: I have had over 12 years experience as an importer of coal. The trade meaning of the expression high volatile coal, similar more or less to Westmoreland, is in Cuba steam lumpy coal. I was familiar with the market price of coal at Sagua la Grande and Caibarien, Cuba, on November 30, 1918. The market price of high volatile coal, similar more or less to Westmoreland, at Sagua la Grande on November 30, 1918, was over $18.00 per ton. The market price of the same kind of coal at Caibarien, Cuba, on November 30, 1918, was the same as in Sagua la Grande. As to query: ' Did you or your firm purchase any coal at Sagua la Grande or Caibarien on November 30, 1918; and if so, please state amount, etc.' We did. 1123 tons at $18.00 per ton Westmoreland coal." Edward Garcia, general manager for the plaintiff, at Sagua la Grande, Cuba, testified that on or about November 30, 1918, there was a great scarcity of rolling stock of the railroads in Cuba, and that this condition had existed for the past six or seven years, and that he was thoroughly familiar with the shipping conditions in Cuba; that on or about November 30, 1918, it was impossible to purchase 7445 tons of high volatile coal similar more or less to Westmoreland for *immediate* delivery at Caibarien or Sagua la Grande; that it was not possible to obtain at Sagua la Grande or Caibarien that amount of coal for *immediate* delivery except by importing it from the United States; that there was plenty of coal in Havana, but it could not be bought any cheaper or delivered any quicker

than if bought at Newport News; that the scarcity of coal cars in Cuba was so great, and the shipping conditions so bad, that it was not possible to get a quick delivery from Havana, that "when a car leaves Havana we never know when it will get there." "We could get quicker delivery from Hampton Roads than we could get from Havana, absolutely;" that the expense of buying coal at Havana, including the transportation to Sagua la Grande and Caibarien, was greater than if the coal had been bought at Newport News; that none of the Havana coal companies would undertake to deliver coal on cars within a certain time.

We are of the opinion that the above evidence, together with that erroneously excluded, with all reasonable deductions and inferences therefrom, was sufficient to make out a prima facie case in favor of the plaintiff, and, since the evidence introduced by the defendant was insufficient to overcome that case so fully as to leave no question for submission to the jury, the court erred in directing a verdict for the defendant. As was so aptly and succinctly said in the case of *Davis* v. *Kirkland,* 1 *Ga. App.* 5 (58 S. E. 209): "No principle is better settled in Georgia than that a verdict should not be directed, unless there is no issue of fact; or unless the proved facts, viewed from every possible legal point of view, can sustain no other finding than that directed. . . . The paramount right of the jury to decide any issue of fact in every case, in Georgia, is absolutely exclusive of any such prerogative on the part of the judge. The exercise of this power by the jury, unless waived by the parties, is an indispensable requisite of a legal trial in this State, and an invasion of this right (as has been held by our Supreme Court times without number) demands the grant of another trial."

The contention of the defendant that the plaintiff's case must fail, for the reason "that the deliveries were to be made by installments and there was no effort to show the market price at any date save on the 30th of November, the last day under a contract covering five months for delivery to be made," is without substantial merit. The contract provided: "Delivery to be made during the months of July to November 1918, inclusive, it being understood that you will *undertake* by every possible means to make a proportionate delivery of the entire quantity in

each month commencing in July next and finishing in November next." Obviously the only absolute and mandatory obligation imposed by the contract was that the coal must be delivered " during the months of July to November, 1918, inclusive." The word " undertake," according to Webster's Dictionary, means, among other things, " endeavor to perform," " attempt," and " try." While it seems true, from the correspondence of the parties, introduced in evidence, that the plaintiff desired the coal delivered in monthly installments, and that the defendant agreed to so deliver it, *if it possibly could,* yet it does not appear either from the contract itself, or from the construction given it by the parties thereto, that the defendant *absolutely obligated* itself to so deliver the coal. Furthermore, the jury were authorized to infer from the evidence that as a matter of fact it was impossible for the defendant so to deliver the coal, and that, when this fact became apparent, both parties to the contract waived the requirement, if there was such a requirement, in the contract, that the coal must be delivered in monthly installments. Under these facts we do not think the failure of the plaintiff to allege and prove the market price of the coal at any date except the 30th of November should prevent a recovery in its favor.

Neither is there any substantial merit in the further contention of the defendant that the " plaintiff's case must fail because he has not alleged and proven that he was able and ready to perform during the time of the existence of the contract, by paying the price at the time and place of delivery." The plaintiff's ability and readiness to pay was not " a condition of the delivery," for the contract expressly provided that payment was to be made " thirty days after date of barges clearance for Cuba," if preferable to seller, " by drafts at thirty days date of clearance of vessels," payable in New York City. Furthermore, there is a clear inference from the evidence that the plaintiff promptly paid the defendant for all the coal delivered under the contract. The evidence also shows that shortly after the breach of the contract the plaintiff bought the amount of coal the defendant had failed to deliver under the contract and paid for it a higher price than the contract price. The jury were authorized to infer from this evidence that the plaintiff was able and ready to pay the defendant the contract price during the life of the contract.

Nor can we agree with the contention of the learned counsel for the defendant that the plaintiff's case should fail because the proof showed that, after the defendant's breach of the contract, the substitute coal was not purchased by the plaintiff in the nearest available market. The only reasons for requiring the buyer to purchase substitute goods in the nearest available market are, first, because conditions there, including the quality of the goods and the price thereof, are apt to be nearer like those at the market fixed for delivery than at a more distant market; and, second, because the cost of transportation therefrom naturally and ordinarily would be less than from a more distant market. However, where the buyer purchases the substitute in a market which is not the nearest available market, but obtains *as good* a substitute and *as cheaply* as he could have bought in the nearest available market, and the cost of transportation from the market in which he bought the goods *is no more* than it would have been from the nearest available market, the reasons for requiring the purchaser to resort to the nearest available market fall. And in *such a case* the failure of the purchaser to buy in the nearest available market will not prevent him from recovering as damages the difference between the contract price and the price of the goods substituted, with cost of transportation to the place of delivery, and other *necessary* expenses. In other words, after the seller breaches the contract by failing to deliver the goods ordered, the buyer is required to do everything necessary and reasonable to lessen his damages (Civil Code, 1910, § 4398), but when he has done that he has done all that the law requires of him. This ruling is simply plain common sense, and its inherent soundness is so obvious that it needs no citation of authority to bolster it up. In the instant case, while it does not appear that the plaintiff purchased the substitute coal in the nearest available market, the undisputed evidence showed that the defendant suffered no loss because of this. While the evidence was perhaps conflicting as to whether or not, after the contract was breached, coal in sufficient quantity could have been purchased by the plaintiff at Havana, the nearest available market, the undisputed testimony was that the 6322 tons of coal purchased by the plaintiff at Newport News, Virginia, were bought and transported to Sagua la Grand and Caibarien at a less cost than

if they had been purchased at Havana, since the market price of coal at Havana was "around $14.00," and the freight rate per ton from there to Sagua la Grande "was $2.63." At these figures 6,322 tons of coal at $14 per ton, plus $2.63 per ton for freight, would amount to $105,134.86, whereas the plaintiff bought this amount of coal at Newport News and transported it to the above-named Cuban ports at a total cost, including purchase-price, freight, demurrage, and insurance, of $102,499.67. As to any American markets nearer and more available than Newport News, suffice it to say that the depositions of the witness Rhol, which the court erroneously excluded, undisputedly show that at the time the coal in question was purchased the government had established prices for export coal and that the price paid by the plaintiff was the "tide-water" price, and also that *the transportation rate fixed by the United States Shipping Board was the same from every American port to the ports of Sagua la Grande and Caibarien.*

While the plaintiff alleged in the petition, and showed by the evidence, what was the market price of coal on November 30, 1918, at the places fixed for delivery, the evidence authorized a finding that, after the breach of the contract, in neither of those markets, nor in any other Cuban market, could the plaintiff have readily obtained for quick delivery the necessary amount of coal of the kind contracted for or of any good substitute therefor. The plaintiff therefore had the right to buy the substitute coal in the nearest available market, or, under the particular and extraordinary facts of this case, to buy it in any market in the United States. (The order of the United States Shipping Board making the cost of transportation the same from any port of the United States to any Cuban port was obviously based upon the abnormal conditions caused by the great World War.) This ruling is not in conflict with those former decisions of this court and of the Supreme Court that hold that the buyer in certain instances must resort to the nearest available market, but in view of the extraordinary fact in this case that the cost of buying the coal at Newport News, Virginia (including the cost of transportation), was no more than if it had been bought in the nearest available market, it is in perfect harmony and accord with the broad principles of fair and just dealings upon which those decisions are based.

In sum, under the particular and peculiar facts of this case, the petition set out a cause of action; the evidence set forth in the bill of exceptions was erroneously excluded; and a finding for the defendant was not demanded by the evidence adduced. The court therefore erred in directing a verdict in favor of the defendant.

*Judgment reversed.  Luke and Bloodworth, JJ., concur.*