A89A0471, A89A0472. KILGORE v. AMRAC, INC.; and vice versa.
(382 SE2d 123)

BANKE, Presiding Judge.

F. H. Kilgore, Jr., purchased a parcel of real estate in northwest Atlanta on which he desired to construct a new home. Before beginning construction, however, he needed to remove an existing home which occupied the site. He discussed the matter with a friend, Steve Allgood, who had a cousin in the demolition business, and through him made arrangements with the cousin, Howard Allgood, to have the house either moved from the site or demolished. If the structure was

moved, Kilgore was to be paid $1,000 for it, and if it was demolished, he was to pay Allgood's company, American Demolition, Inc., $2,000 for its services. Kilgore's primary concern was to remove the house without damage to the trees on the lot, and the idea of moving it rather than demolishing it did not originate with him.

On or about February 23, 1984, Howard Allgood entered into a written agreement with AMRAC, Inc., through its president, Charles Ray Whitetree, whereby he agreed to sell Kilgore's house to AMRAC for $3,500, and AMRAC, in turn, agreed to remove the house from the lot "within thirty (30) days after release." This "release" provision had reference to the fact that the house was occupied at the time by Kilgore's son, who, of course, needed to vacate it before it could be moved.

A day or two after the contract between AMRAC and Allgood was executed, AMRAC, again acting through Whitetree, contracted to sell the house to Frank Cookson for $28,500. This contract specified that the house would be cut in half, delivered in segments to Cookson's lot, and "put back together structurally sound" on a foundation to be provided by Cookson. It contained the following disclaimer: "If structure is destroyed due to fire, vandalism, or other acts not controlled by the mover or seller, liabilities are limited to the actual amounts of deposits only." The amount of the deposit paid to AMRAC by Cookson was $8,500.

Although his son did not vacate the house until late March, Kilgore had, by the first of April, become impatient to see the house gone from the property. On April 6, 1984, he telephoned Whitetree to urge him to get the project underway, telling him: "Look, if you don't have it out by the 11th, . . . just forget it; I'll tear the house down." Kilgore testified that at the time he made this call he had not yet met Whitetree and had only that same day learned his name. On April 12, Kilgore visited the property, where he found Whitetree still engagd in preparations for the move. At this time, Kilgore told Whitetree he was no longer interested in having the house moved and ordered him to take his equipment and leave the premises. Whitetree ignored these instructions and continued working. This confrontation appears to have poisoned all subsequent dealings between the two men.

Whitetree subsequently threatened to obtain an injunction against Kilgore to prevent him from demolishing the structure before it could be moved. To avoid such legal action, the parties agreed in writing to a settlement on April 16, 1984, at a meeting which took place at the courthouse. Pursuant to the terms of this agreement, AMRAC was to subcontract the removal of the house, and the move was to be completed "no later than the close of business April 27, 1984." Additionally, AMRAC agreed to pay American Demolition a damage deposit in the amount of $1,000 against any damage which

might be caused to Kilgore's property in excess of that which was specifically contemplated by the agreement. The agreement identified four trees on the property (including one dead tree) which AMRAC was authorized to cut down in order to effect the removal of the house from the lot. Of specific concern to Kilgore was the preservation of two large pine trees and several dogwood trees bordering the driveway along which the house was to be moved. Kilgore was authorized to "have a representative at the site [with] the authority to stop work if not proceeding in accordance with this agreement."

The subsequent preparations for the move got off to a bad start when Whitetree bulldozed a swath in the woods alongside the driveway, thereby destroying several of the smaller trees which Kilgore had wished to preserve. By the morning of April 26, the house had been cut into two segments, and the removal of one of the segments from the foundation was about to commence. Kilgore measured the two segments at this time and determined that the larger of them was 29 feet 3 inches wide. He had previously measured the distance between the two large pine trees, which were located across the driveway from each other, and had determined that the distance between them was only 26 feet. He confronted Whitetree with these measurements and told him he would not be permitted to move the house unless he divided it again. According to Kilgore, whose testimony in this regard was not controverted, Whitetree's only response was to say, "I'm going to come on through." A stalemate thereupon ensued, during which Kilgore continued to insist that Whitetree either "cut [the house] where it wouldn't damage those trees any more or leave the property," while Whitetree continued to manifest his intention to proceed as planned. Finally, after repeatedly refusing to leave the property voluntarily, Whitetree was arrested for criminal trespass by an off-duty Atlanta police officer whom Kilgore had hired to be present on the scene in the role of his contractually authorized representative. A few days later, the house was demolished by American Demolition.

At trial, Whitetree testified that, had he been allowed to try, he believed he could have cleared the two pine trees by leaning the house on an angle, maintaining that it would have been possible to "cock the house as much as three or four feet without any problem of losing the house. . . ." He did not explain how lifting one side of the house three or four feet higher than the other would have reduced the horizontal space occupied by the structure by the 3'3" necessary to enable it to fit between the two pine trees, nor was he able to recall whether he had explained this plan to Kilgore, who, as previously indicated, testified without dispute that Whitetree's only response upon being confronted with the difference between the two measurements was to insist that he was "coming on through" anyway. American Demolition's president, Howard Allgood, testified that, based on his experi-

ence in the demolition business, he believed tipping the house in the manner described by Whitetree would have caused it to fall apart. Later, Whitetree's counsel conceded that the house would have fallen over had it been "tilted upon its side."

Whitetree filed the present action against Kilgore, Howard Allgood, Steve Allgood, and American Demolition, Inc., to recover damages for breach of contract; and Kilgore counterclaimed to recover for the unauthorized damage to his property allegedly caused by Whitetree. Based on Whitetree's testimony that he would have made an estimated profit of $10,000 on the resale of the house to Cookson and that he had been forced to expend approximately $21,500 to secure an acceptable replacement house for Cookson, the jury returned a verdict in his favor against Kilgore in the amount of $31,500, while at the same time, awarding Kilgore $250 on his counterclaim against Whitetree. Also, the jury held American Demolition, Howard Allgood, and Steve Allgood jointly liable to Whitetree for $4,500, representing the $3,500 which the latter had paid for the house, plus his $1,000 damage deposit. Kilgore initiated the present appeal, contending that the evidence was insufficient to support the jury's verdict against him; and Whitetree filed a cross-appeal, complaining of the trial court's failure to give certain jury charges which he had requested. *Held*:

1. We must agree with Kilgore that the evidence did not support a finding that he had breached the contract. Kilgore's concern for protecting the trees on his property was specifically reflected in the contract, which specified that Kilgore's representative on the scene would be authorized to stop the work "if not proceeding in accordance with this agreement." When confronted at the scene by the measurements showing that one of the segments of the house was more than three feet wider that the space between the two pine trees, Whitetree offered Kilgore no logical explanation as to how he could have moved the structure between these trees without damaging them, nor did he offer any such explanation at trial, except to speculate on the possibility that the trees may have been farther apart at the top than at the base. Based on the undisputed facts established by the evidence, we hold that the trial court erred in denying Kilgore's motion for directed verdict on the issue of liability.

2. Even assuming arguendo that there was a breach of the contract by Kilgore, and even assuming further that Whitetree was entitled to recover his lost profits from the proposed sale of Kilgore's residence to Cookson as damages for this breach, the evidence would not, in any event, have supported an award in his favor in the amount found by the jury, i.e., $31,500. This award was evidently calculated by taking Whitetree's estimate of his lost profit on the sale of Kilgore's house, in the amount of $10,000, and adding to it the $21,500 in expenses which Whitetree said he had incurred in providing Cookson

with an acceptable replacement house. However, Whitetree would have suffered damages in the latter amount only if he had provided the replacement house to Cookson free of charge, something he was clearly not obligated to do and presumably did not do. (Indeed, according to the terms of his contract with Cookson, his liability in the event of the destruction of Kilgore's house due to "acts not controlled by" him was limited to the return of Cookson's deposit.) Assuming Cookson paid AMRAC the same amount for the replacement house that he had contracted to pay for Kilgore's house (i.e., $28,500), AMRAC's lost profit on the transaction would not have been $31,500 but merely $8,000 — the difference between the $21,500 cost of purchasing, moving, and re-installing the replacement house and the $13,500 estimated cost of purchasing, moving, and re-installing Kilgore's house (a figure Whitetree arrived at by adding to the $3,500 he had paid for the house the $10,000 he estimated it would have cost him to relocate it). Cf. *Hardwood Lumber Co. v. Adam & Steinbrugge*, 134 Ga. 821 (68 SE 725) (1910).

3. The cross-appeal is rendered moot by the foregoing. The portion of the judgment awarding damages against Kilgore is reversed. The remainder of the judgment is not affected by this decision.

*Judgment reversed in part in Case No. A89A0471. Appeal dismissed in Case No. A89A0472. Sognier and Pope, JJ., concur.*

DECIDED APRIL 17, 1989 —
REHEARING DENIED MAY 8, 1989 —

*Carr & Kessler, Kathleen Kessler, Pannell & Christenson, Winnie P. Pannell, Samuel J. Brantley*, for appellant.
*E. Wayne Wallhausen*, for appellee.